**UNIVERSAL C. I. T. CREDIT COR-
PORATION, Appellant,**

v.

**MIDDLESBORO MOTOR SALES, INC.,
et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 9, 1968.

Robert J. Watson, William A. Watson, Watson & Watson, Middlesboro, Bert Combs, Julius Rather, Lexington, for appellant.

J. C. Helton, Pineville, Edward M. Dooley, Middlesboro, Robert Berger, Pineville, E. P. Nicholson, Jr., Middlesboro, for appellees.

OSBORNE, Judge.

Middlesboro Motor Sales, Incorporated, one of the appellees herein, was engaged in the business of selling new and used cars and held the Chrysler-Plymouth franchise for Middlesboro, Kentucky. The corpo-

ration had been in business for several years. It was owned by James Sharp, also an appellee herein, and president of the corporation. His wife, Mary Sharp, worked at the business and was secretary-treasurer of the corporation. Edward Mason was chief salesman and vice-president of the corporation. Mrs. Sharp and Mason are also appellees herein. The motor company had a wholesale financing arrangement wtih Universal C. I. T. Credit Corporation, appellant herein, under which C. I. T. would advance money on all new cars and on some used cars for the motor company. As part of the agreement, the motor company was to use cars secured under the agreement only for the purpose of showing and demonstrating and were to pay the company whenever such cars were sold. To protect their investment C. I. T. made frequent but irregular car checks at the premises to insure that the covered cars had not been sold without the proceeds being reported.

On January 23, 1964, a car check was made and it was discovered that four cars were missing. Mr. Sharp was not present, and Mrs. Sharp issued a check in the amount of $10,402.31 which was the amount of the wholesale loan on these four cars. On January 27, both the motor company and C. I. T. learned that this check was being returned by the bank for insufficient funds. During the next four days C. I. T. kept asking for payment but did not demand it or threaten suit. The motor company kept insisting they would try to raise it although they didn't promise to. Mr. Sharp, who had been sick, did not attempt to contact C. I. T. and did not come to the business. However, he resumed selling cars from his home. Most of the major receipts of the company during this period were turned into cash and turned over to Mr. Sharp who held them in his pants pocket ostensibly to raise enough money to pay the returned check. However, this intention was never communicated to C. I. T. On January 30, the company offered to pay C. I. T. some

$3,000, part of which was for cars not included in the $10,402.31 check, and turn over the title certificates on the cars covered by loans. C. I. T. neither accepted nor refused this offer. The same day they learned that a check which had been given them for payment of their loan on another car had been stopped, and apparently were told that a blanket stop payment order on all checks issued to C. I. T. had been made by Mrs. Sharp. C. I. T. then brought a claim and delivery action for all the cars held by the company. Possession of these cars was taken the same day by the sheriff. Some time later C. I. T. instituted an action for debt and attached the same cars and the bank accounts of the corporation. The motor company filed a counterclaim in this action, and recovered a judgment of $100,000. The validity of this judgment is the chief question before the court in this appeal. However, it is not the only issue. Two of the cars seized under the claim and delivery action were claimed to be owned by Mary Sharp and Edward Mason individually. They had each given a lien on these cars to one of the local banks. The banks intervened in the claim and delivery action claiming their lien was superior to that of C. I. T. On this issue the trial court directed a verdict for the banks. C. I. T. is appealing from this determination.

■ The motor company apparently bases its claim on two theories. The first is that C. I. T. had no right to institute action at that time because their previous conduct waived the requirement that payment be made for each car at the time it was sold, and that their contention of insecurity was unfounded, or at least at that time they did not have sufficient information to feel insecure. This contention of waiver is based on the fact that in the past C. I. T. had accepted payment for cars at the time of the car checks, and they should have and must have realized that all of these cars were not sold immediately before the check. However,

C. I. T. showed that many cars had been paid for at times other than the car checks. Mr. Sharp testified that one of the managers of C. I. T. had asked him to pay more promptly. To support its contention the motor company cites KRS 355.2–208 on the effect of a course of conduct on a contract. This section deals with sales only. As to secured transactions the code apparently does not contain a rule for varying the contract by performance. In any event, the contract in question contains a provision covering this situation. It provided that "waiver of any default is not waiver of any subsequent default." This court has previously upheld this provision in a conditional sales contract which is also a secured transaction, and there seems to be no reason not to follow it here. Home Finance Company v. Frazier, Ky., 380 S.W.2d 91. The motor company cites no Kentucky precedent to the contrary, nor have we located any. There seems to be no reason not to apply the provision in this type contract. In any event, the course of conduct theory would only relieve the motor company of the obligation to pay prior to the car checks. It would not relieve them of a duty to pay not later than the car checks. Therefore, they were in default when they gave a bad check for the cars.

■ The second theory is that even though C. I. T. was within its rights under the contract in bringing the claim and delivery action, the circumstances surrounding it show a lack of good faith and it therefore breached the condition required in enforcement of rights under a contract by the Commercial Code. This requirement, KRS 355.1–203, is "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." The conduct relied upon as a breach of this requirement is that C. I. T. led the company to believe they were being given time to raise the money by first not demanding immediate payment or threatening to take action if immediate payment was not forthcoming, and

secondly by accepting two checks in partial payment, one for $1000 and another for $950. The motor company later stopped payment on the $950 check. This contention is not based on any specific promise of time, but simply on the failure to demand immediate payment or to refuse anything less than full payment. The legal basis for this type of claim is found in Skeels v. Universal Credit Corporation, 3 Cir., 335 F.2d 846 (1964). That case also involved a car dealer and the same finance corporation. However, in that case, C. I. T. had promised through a local manager to make a substantial loan to the dealer. The dealer relying on this paid other bills and let himself get very short on cash. C. I. T. then refused the loan, made a car check, and found various cars missing and when he was unable to pay took possession of the cars by self-help. The facts in this case are much weaker. There was no specific assurance, and the company has not shown that they relied on any specific assurances to their detriment. Under these facts it cannot be said that C. I. T.'s action amounts to bad faith. The motor company has failed to make out a case on which relief could be granted. The trial court should have granted C. I. T.'s motion for a directed verdict on the dealer's claim for damages.

## UCIT V. BANKS

We now come to the question of priority of liens between the two banks and C. I. T. on the cars which Mary Sharp and Edward Mason purchased. The lower court directed a verdict for the banks on this issue. The facts in this issue are fairly clear. Early in December, Mason went to the Commercial Bank to borrow money to buy a new Valiant from the motor company. At their request he procured a signed and notarized sale contract from the motor company to him, which reserved a security interest in the motor company. The motor company then assigned this lien to the bank and the bank made out a draft to the motor company for the wholesale price

of the car. This draft was deposited to the account of the motor company. Mason kept this car at the place of business, with dealer's tags on it, and accounted for it on car checks. C. I. T. did not realize that it had been sold until shortly before the claim and delivery action was brought. The motor company did not at any time pay or offer to pay the wholesale loan on this car which was owing to C. I. T. Mason did not present the bank with a registration certificate, indeed did not obtain one in his name until January 30.

The Mary Sharp transaction occurred during the final hectic week. She went to the bank on Monday, January 25, and applied for a personal loan of $2000 to be secured by a 1963 Plymouth she said she owned. The car in question had been traded in to the company. C. I. T. had advanced $1750 on this car and a trust receipt evidencing this advance was signed by Mary Sharp herself. On January 27 she had a registration receipt issued to herself. She took this registration receipt to the bank where she gave a security interest on the car and obtained the $2000. She testified that she gave her husband $1000 from this and traded in a car she owned which was worth $750. Her husband verified the transfers and the ownership of the traded-in car. C. I. T. offered evidence that the car she claimed to have traded was registered in the name of the motor company. Sometime on January 30 the motor company through their accountant offered to pay C. I. T. for certain cars. One of these was the Mary Sharp vehicle. This was after the stop-payment order to the bank on checks to C. I. T. and this offer was made in lieu of paying anything else at the time.

Though the entire history of these two transactions is riddled with questionable behavior on the part of Mary Sharp and Edward Mason, it is nowhere shown that the banks knew or should have known of anything wrong.

The sort of transactions involved herein is not uncommon among the types of businesses involved. Generally with this type of inventory financing, the lien of the wholesale financer is automatically extinguished upon sale. This is under KRS 355.9–307 which provides that "A buyer in ordinary course of business (as defined in KRS 355.1–201(9)) * * * takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." KRS 355.2–403(2) provides that where goods are entrusted to a dealer, he can give good title, but this section again requires that the one to be protected must be "a buyer in ordinary course of business."

Considering these sections alone, the banks prevail only if Mary Sharp and Edward Mason were "buyer in ordinary course of business" and if they would have prevailed against C. I. T. The code sets out very specific requirements for such a person. KRS 355.1–201(9), the definitional section provides, "(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind * * *." Obviously, Mary Sharp and Edward Mason do not meet these requirements. There is a definite question about their "good faith" in this situation. The Pennsylvania Supreme Court reached this result under similar facts in Taylor Motor Rental, Inc., v. Associates Discount Corp., 196 Pa.Super. 182, 173 A.2d 688 (1961).

However, here we have additional facts which in our opinion will have to change the result. In the case at bar the contract provided, the motor company "shall have liberty to exhibit and to sell each chattle in the ordinary course of trade and for the *respective Principal Obligations* shown in the respective statements." (Em-

phasis added). Therefore, the lien would be released under KRS 355.9–306(2) which provides: "Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor *unless his action was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (Emphasis added). The effect of this provision of the code and the provisions of the security agreement is to release the lien. The banks' evidence shows that sales to officers and employees were common and usual among car dealers in the area. From this evidence we conclude that this sale was in the ordinary course of trade.[1] They further presented evidence that the individuals involved paid the motor company the wholesale price of the cars which is the respective Principal Obligations referred to in the security agreement. This evidence was

not seriously disputed, therefore, the judge was not clearly erroneous in directing a verdict for the banks. We do not hereby decide the issue of what would happen if the security agreement did not allow such sales. It could be that the section above referred to is broad enough to protect a bank, which with no knowledge of violation of the agreement, loans money in this type situation in reliance on the apparent authority of the retailer to make the sales. The official annotation to the code and the case of Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726 seem to indicate that this might be the result under such a factual situation.

For the reasons stated above, the judgment for Middlesboro Motor Sales against C. I. T. is reversed and on remand the trial judge should enter a judgment n. o. v. for C. I. T. The judgment for the appellee banks against C. I. T. is affirmed.

All concur.

1. This term appears to be deceptively like "buyer in the ordinary course of business" referred to above. However, "buyer in the ordinary course of business" is a specifically defined term in the code, and a reading of its definition shows that it specifically imposes several requirements in addition to a sale being in the ordinary course. For a definition of sales "in the ordinary course of trade" when not specifically defined otherwise see Stemmons, Inc., v. Universal C. I. T. Credit Corp., Okl., 301 P.2d 212 (1956). In that case, the court looked strictly to proof that the acts were common and ordinary practice among local businesses of the same type.