In the Matter of KEYSTONE
GENERAL, INC., Debtor.

ASSOCIATED INDUSTRIES, Plaintiff,

v.

KEYSTONE GENERAL, INC.,
et al., Defendants.

Bankruptcy No. 1–89–0238.
Adv. No. 1–89–0238.

United States Bankruptcy Court,
S.D. of Ohio.

Dec. 12, 1991.

Edmund Adams, Vincent Mauer, Frost & Jacobs, Cincinnati, Ohio, for plaintiff.

Randy Slovin, Nicholas Pantel, Richard Boydston, Timothy Hurley, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

J. VINCENT AUG, Jr., Bankruptcy Judge.

> Two good men, Semler and Lee
>
> Made a Deal that could not be
>
> Reserving title on delivery
>
> They ran afoul of the UCC
>
> And so Star Bank over its opponents
>
> Holds secure the "Kentucky Components."

The rather complex facts underlying this commercial transaction belie the two relatively simple issues before the Court. The first issue is whether the transferor of inventory made an effective reservation of title under the Uniform Commercial Code so as to defeat the rights of the transferee's secured lender. The second issue is whether the interstate transfer of inventory back to the transferor defeated the rights of the transferee's secured lender.

## FINDINGS OF FACT

Keystone General, Inc. ("Debtor") was in the business of manufacturing various radios for military and commercial use. In May, 1986, the Debtor refinanced its existing long-term bank debt with a $5,000,000 revolving credit loan from Star Bank, N.A. Cincinnati ("Star Bank"). Pursuant to the loan documents, including a security agreement, the Debtor granted Star Bank a security interest in substantially all of the Debtor's personal property, including the Debtor's inventory. Inventory is defined in the security agreement as follows:

> Inventory which means goods, merchandise and other personal property, now owned or hereafter acquired by the Borrower (the Debtor), which are held for sale or lease or are furnished or to be furnished under a contract of service or are raw materials, work in process or materials used or consumed or to be used or consumed in the Borrower's (the Debtor's) business, and whether in Borrower's (the Debtor's) possession or in the custody or possession of a third party for the account of Borrower (the Debtor) or the Bank (Star Bank), and all accessions, proceeds and products thereof.

Star Bank perfected its security interest in the Debtor's property, including the inventory, by filing the appropriate financing statements with the Recorder of Hamilton County and the Ohio Secretary of State.

In 1987, certain radio components were offered for sale by E–Systems, a Florida company, which components the Debtor wished to purchase. The then president of the Debtor, Robert Lee ("Lee"), contacted Arnold A. Semler ("Semler"), president of Associated Industries, a division of Arnold A. Semler, Inc., ("Associated") and requested that Associated assist the Debtor in the purchase of the components. The Debtor was not in a position to buy the components directly from E–Systems because of its financial condition and because of "bad blood" between Lee and the principals of E–Systems. Essentially, Associated was to be the front man for the Debtor. Associated would buy the components from E–Systems and then turn around and sell the components to the Debtor. The Debtor

planned to use most, if not all, of the components in the manufacture of radios which it hoped to sell to the U.S. government, pursuant to government contracts.

Associated agreed to purchase the components and on September 21, 1987, issued a purchase order to E–Systems thereby obligating Associated to pay E–Systems the amount of $2,700,000. In turn, the Debtor agreed to pay $3,500,000 to Associated for the components, creating an anticipated profit of $800,000 for Associated. At trial, testimony was elicited from both Lee and Semler that the $3,500,000 purchase price was a "good deal" and a "real bargain". Evidence at trial showed several internal documents prepared by Associated identifying a $3,500,000 balance due from the Debtor to Associated by virtue of this transaction.

The writings constituting the agreement between the Debtor and Associated for the purchase of the components were a Master Governing Invoice dated November 6, 1987, and the Debtor's Purchase Orders to Associated Nos. 17289 and 17290. The purchase price of $3,500,000 was reflected in the Master Governing Invoice as being payable in four installments. Notwithstanding the clear terms of the Master Governing Invoice, Semler and Lee had an oral understanding that Associated would be paid through progress payments that the Debtor would receive from the government. A progress payment is the receipt of money from the government prior to the completion of the goods being produced for the government. Under its contracts with the government, Debtor was entitled to receive progress payments if it had incurred the cost of obtaining the property *and* if it had title to the property. When the Debtor requested a progress payment, it had to certify to the government that it had unencumbered title to the property.

Semler and Lee had an understanding that title to the components would pass from Associated to the Debtor only after Associated received full payment for the components. This understanding was reflected in the Master Governing Invoice which contained the following provisions:

1. All material shipped by Associated Industries covered by these purchase orders are to be kept at [the Debtor's] segregated from other material.
2. Associated Industries is to maintain title to this material until such time as the corresponding invoice is paid, upon which time the title will transfer to [the Debtor].

On direct examination, Lee testified that title did not pass to the Debtor until the Debtor received progress payments which would then be paid to Associated. On cross-examination, however, Lee testified that title passed when the Debtor *submitted* progress payment requests to the government.

The components purchased by Associated were shipped in four lots directly to the Debtor from E–Systems in Florida. Due to the large size of the shipment, the components were initially received at a separate warehouse in Hamilton County leased by the Debtor for purposes of receiving this shipment. Eventually, all components were transferred to the Debtor's main facility for the lengthy and painstaking process of inspection. While Associated attempted to show at trial that these components were segregated from the other inventory of the Debtor as required by the Master Governing Invoice, testimony of the Debtor's employee who was responsible for the incoming inspection of these components refuted this allegation. Accordingly, we find there were no special instructions given with respect to the treatment of these components and that the components were neither segregated nor separately identified from other inventory of the Debtor.

Sometime after the purchase of the components, the Debtor realized that it could only assign approximately $1,600,000 of the components to government contracts rather than the anticipated $2,700,000 amount. On or about January 20, 1988, a portion of the components ("Kentucky Components") were transferred from the Debtor's facility in Ohio to a warehouse in Kentucky leased by Associated. Semler testified that he had Associated take back the Kentucky

Components because of the Debtor's shaky financial position. In exchange for the transfer of the Kentucky Components, Associated issued to the Debtor a credit memorandum dated January 20, 1988 in the amount of $1,909,952, thereby deducting the value of these components from the $3,500,000 Master Governing Invoice. Star Bank was not aware of the transfer of inventory from the Debtor to Associated. Neither the Debtor nor Associated sought Star Bank's prior or subsequent consent to such transfer. Thomas Huenefeld, the bank officer primarily responsible for the loan, testified that he learned of this transfer sometime in 1988, "well after" the fact.

Subsequently, the Debtor determined that it could utilize a portion of the Kentucky Components on government contracts. The Debtor therefore requested that Associated transfer $450,640.95 worth of the components back to the Debtor. Associated complied with this request in February, 1988. As a result of this transaction the value of the remaining Kentucky Components, based on the Master Governing Invoice price, was $1,459,311.05. Star Bank offered expert testimony that the value of these Kentucky Components was actually $2,840,000. In August, 1989, Associated placed a value of $100,000 on the Kentucky Components in its annual financial statement. In November, 1989, Associated agreed to sell the Kentucky Components to Electronic Microsystems, Inc. for $250,000.

The unpaid balance on the Master Governing Invoice is $1,022,391.69.

The Debtor filed its bankruptcy petition on November 15, 1989. In its schedules the Debtor listed the claim of Star Bank at $4,850,000, with the secured portion of the claim being $500,000. In its trial brief, Associated withdrew any claim that it had a security interest, perfected or unperfected, in any property of the Debtor.

Associated initiated this adversary action against the Debtor, Star Bank and the Department of the Army raising several claims, most of which were resolved immediately prior to trial. The remaining claims heard at trial were as follows: The claim of Associated against Star Bank as to the validity and perfection of the security interest of Star Bank in the Kentucky Components; the claim of Star Bank against Associated for money damages for conversion of the Kentucky Components.

## CONCLUSIONS OF LAW

### I. Transfer of Inventory From Associated to the Debtor.

■ In May, 1986, Star Bank obtained a valid and perfected security interest in the Debtor's inventory as defined in the security agreement, which included after-acquired inventory. We find that the transfer of radio components from Associated to the Debtor in the fall of 1987 was a sale of inventory to the Debtor and that said inventory was subject to the perfected security interest of Star Bank.

Although the Master Governing Invoice contained explicit language that Associated intended to retain title until paid in full and although this may have been the oral understanding between Associated and the Debtor, the Uniform Commercial Code and interpreting caselaw on this issue clearly prohibit the retention of title by Associated.

Pursuant to Ohio Rev.Code Ann. § 1302.-42(B)(2):

> Unless otherwise explicitly agreed title passes to the buyer at the time and place which the seller completes his performance with reference to the physical delivery of the goods ...

When the goods were delivered to the Debtor in Ohio, the seller had completed his performance and title passed to the Debtor. The Debtor was obligated to pay the purchase price of $3,500,000 to Associated for the components. Although Associated attempted to argue that the Debtor never really owed this money, hoping to negate the finding of a sale, this argument has no credibility in the face of Associated's internal documentation and in the face of Associated's claim against the Debtor for the balance due under the Master Governing Invoice.

Pursuant to Ohio Rev.Code Ann. § 1302.-64(A):

> Acceptance of goods occurs when the buyer (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or (2) fails to make an effective rejection; ... or (3) does any act inconsistent with the seller's ownership ...

The Debtor accepted the inventory under the code provision. Although perhaps not usable on a specific government contract, the goods were never found by the Debtor to be nonconforming. Further, the subsequent transfer of a portion of components to Kentucky was not a rejection. Lastly, the Debtor acted inconsistently with the seller's ownership of the goods.

Pursuant to Ohio Rev.Code Ann. § 1302.-42(A):

> ... Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest ...

The statute is clear. The retention of title merely results in the creation of a security interest. *See, e.g., DeVita Fruit Co. v. FCA Leasing Corp.*, 473 F.2d 585 (6th Cir.1973) (seller's retention of title had the effect of the reservation of a security interest.)

While the Uniform Commercial Code does permit the parties some power by allowing the parties to agree as to when title will transfer, the Code and the caselaw place a limitation on this power. In short, if the seller attempts to retain title after delivery or until paid in full, all the seller gets is a security interest. *See, In re Bosson*, 432 F.Supp. 1013, 1020–21 (D.Conn. 1977) (The Code "negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained."); *In re Julien Co.*, 128 B.R. 987, 996 (Bankr. W.D.Tenn.1991) ("... when such an agreement involves retention of documents of title after shipment or delivery, it is limited

in effect to the granting of a security interest."); *In re Continental Fire Trucks, Inc.*, 33 B.R. 713, 715 (Bankr.D.Mass.1983) (explicit agreement of parties that title would not pass until payment in full and delivery of documents of title does not prevent title from passing); *In re Tom Woods Used Cars, Inc.*, 21 B.R. 560, 565 (Bankr. E.D.Tenn.1982) ("It is important to understand that the parties to a sale can agree on when title passes only to a degree. Any retention or reservation of title in seller after delivery to the buyer amounts to retention of a security interest").

The rationale behind the Code and the caselaw is the prevention of "hidden-title subterfuge" which would occur if such a reservation of title was permitted. *Kinetics Technology International Corp. v. Fourth National Bank of Tulsa*, 705 F.2d 396 (10th Cir.1983). A main purpose of the Uniform Commercial Code is its overall scheme favoring notice filing; a hidden title provides no notice. As a supplier to the Debtor, Associated could have protected itself against Star Bank by taking the appropriate steps regarding a purchase money security interest as outlined in Ohio Rev.Code Ann. § 1309.31(C). It failed to do so.

Associated cites only one case, *Schenley Affiliated Brands Corp. v. Limbach, Tax Commissioner*, 45 Ohio St.3d 90, 543 N.E.2d 1177 (1989), for the proposition that Associated could retain title to the components until it was paid in full. However, the *Schenley* case may be distinguished on several grounds. First, a true bailment of the subject goods was at hand in *Schenley*. Second, the subject goods were liquor, therefore being subject to extensive state regulation in addition to the Uniform Commercial Code.

When title to the inventory passed to the Debtor, the Debtor obtained the prerequisite rights in the collateral under Ohio Rev. Code Ann. § 1309.14 allowing the attachment of Star Bank's security interest to the inventory.

■ The fact that the Debtor had title to the Kentucky Components for only several

months does not defeat the security interest of Star Bank. There is no requirement that the Debtor have rights in the collateral for a certain period of time.

■ It cannot be said that Star Bank is receiving a windfall if, in fact, its secured loan turns out to be just that—secured. Lenders often take a security interest in after acquired inventory because of the nature of inventory being in a constant state of flux. There is no requirement that a lender must expect or act in reliance on any given inventory owned by the Debtor as a prerequisite to attachment. Such is not mandated by the Code and such would not make good business sense.

The transaction between Associated and the Debtor was neither a consignment nor a bailment as defined in the Uniform Commercial Code. No evidence was presented at trial that either party ever intended to create a consignment or a bailment. Even if a consignment were found to have existed, Associated did not make the appropriate filings as required under Ohio Rev. Code Ann. § 1309.11.

Since Associated had only a security interest in the components, which security interest was not perfected; and since Star Bank did have a perfected security interest in the components, the interest of Star Bank in the components is senior to that of Associated. Ohio Rev.Code.Ann. § 1309.-20.

## II. Transfer of Inventory From the Debtor to Associated.

■ Having found that the transfer of $3,500,000 worth of radio components from Associated to the Debtor was a sale, we also find that the subsequent transfer of $1,909,952 worth of radio components from the Debtor back to Associated was also a sale.

In January, 1988, the Debtor transferred a portion of the original components ("Kentucky Components") back to Associated at Associated's request. In consideration of this transfer, Associated issued to the Debtor a credit memorandum dated January 20, 1988 in the amount of $1,909,952. On January 15 and 16, 1988 the Kentucky Components were shipped to a warehouse in Kentucky which was leased by Associated. We find that the credit memorandum was issued contemporaneously with the transfer of the components to Kentucky. We also find that at the time of the sale, all of the Kentucky Components were located at the Debtor's facilities in Hamilton County, Ohio and that the sale to Associated did not occur *after* the transfer of the components but *because* of the transfer of the components.

Pursuant to Ohio Rev.Code Ann. § 1309.-25(B):

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and continues in any identifiable proceeds including collections received by the debtor.

Star Bank was not aware of the sale nor did it authorize the sale. Accordingly, the security interest of Star Bank in the Kentucky Components followed the collateral. *See, Crocker National Bank v. Ideco Div. of Dresser Industries, Inc.,* 889 F.2d 1452 (5th Cir.1989) *cert. denied,* 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990) (Where Heco sold engines to TOS and TOS never paid for them but sold them back to Heco for a credit memorandum, the court held that the bank's right to the engines as a holder of a perfected security interest was superior to Heco's claim as an unpaid seller no longer in possession of the engines).

■ Associated argued that Star Bank's security interest in the Kentucky Components became unperfected when it failed to file UCC–1 financing statements in Kentucky. This argument is without merit.

Pursuant to Ohio Rev.Code Ann. § 1309.-03(A)(4) and Kentucky Rev.Stat. 355.9–103(1)(d), which addresses the perfection of a security interest in ordinary goods in multiple state transactions, the secured party must file a financing statement in the new jurisdiction within four (4) months of

the transfer of the goods, or its security interest will become

> ... unperfected at the end of that period and is thereafter deemed to have been unperfected against a person who became a purchaser *after removal* (emphasis added.)

Pursuant to Ohio Rev.Code Ann. § 1309.-39(G)

> ... a filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

The Official Comment to this Code section is instructive.

> Subsection (G) also deals with a different problem, namely whether a new filing is necessary *where the collateral has been transferred from one debtor to another.* This question has been much debated both in pre-Code law and under the Code. The Article now answers the question in the negative. Thus, any person searching the condition of the ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if circumstances seem to require it.

The four (4) month rule is designed to cause the secured creditor to refile a financing statement in the new jurisdiction when the debtor keeps the collateral, but moves the collateral to a new jurisdiction. In such a situation, if the secured creditor fails to refile, a purchaser *after* transfer may prevail over the secured party. When the sale itself results in an interstate transfer of the collateral, the secured party does not need to refile. Otherwise, any out of state purchaser would be able to defeat a valid and perfected security interest. *e.g.* *In re Southern Properties, Inc.,* 44 B.R. 838 (Bankr.E.D.Va.1984). The cases cited by Associated for the proposition that Star Bank's security interest in the Kentucky Components was conditioned upon Star Bank's refiling in Kentucky within four months are inapposite or distinguishable. In *In re Ken Gardner Ford Sale, Inc.,* 41 B.R. 105 (Bankr.E.D.Tenn.1984) and *In Re Maltezos,* 35 B.R. 800 (Bankr.N.D.Ohio 1983), the debtors retained title to the collateral and merely moved the collateral to a new jurisdiction; the secured creditors who did not refile in the new jurisdictions were found to have unperfected security interest subordinate to that of the bankruptcy trustees as lien creditors. In *United States v. Handy and Harman,* 750 F.2d 777, 783 (9th Cir.1984), the debtor sent scraps to a refiner in another state, asking for the value of the scrap after refining. The Ninth Circuit held that since the secured party failed to refile in the new state, its security interest became unperfected. However, the court remanded the case for a decision on whether or not the supplier had knowledge of the security interest. Because a decision from the Ninth Circuit is not binding on this court, and because it is unclear from the opinion as to whether or not the interstate transfer of collateral occurred because of the sale or before the sale, (or whether that court even considered that factor at all) we choose not to follow this case.

■ Associated is not afforded the protection allowed by the Code to a buyer in the ordinary course as set forth in Ohio Rev.Code Ann. § 1309.26. Pursuant to Ohio Rev.Code Ann. § 1301.01(I), a buyer in the ordinary course

> means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in the ordinary course from a person in the business of selling goods of that kind.... Buying ... does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

The Debtor was in the business of selling completed radios, not radio components. Also, the sale to Associated was in satisfaction of an existing money debt.

In conclusion, Star Bank's perfected security interest in the Kentucky Components continued in the Kentucky Components notwithstanding the sale to Associated.

Regardless of any intentions, good or bad, of the parties, Associated and the Debtor attempted to create a secret lien, something simply prohibited by the Uniform Commercial Code. Once the security interest of Star Bank attached to the collateral, a transfer or sale back to Associated will not be found to sever the attachment. To hold otherwise would be to give force to the prohibited secret lien.

We also make note of the fact that this was to be an "easy deal" for Associated; it paid $2,700,000 for the radio components with the knowledge that the Debtor would be buying the components from Associated for $3,500,000. However, when Associated made this purchase, it took the risk that the Debtor would not be able to complete its contemplated government contracts.

*III. Damages.*

■ Under the Uniform Commercial Code, where a debtor sells collateral subject to a perfected security agreement, the secured party may proceed against the purchaser by an action in trespass for conversion of the collateral *e.g., John Deere Co. v. Yoder*, 1981 WL 5673 (Ohio App.1981) (unpublished opinion); *Crocker National Bank v. Ideco Div. of Dresser Industries, Inc.*, 889 F.2d 1452 (5th Cir.1989), *cert. denied*, 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990). A plaintiff in a conversion action is generally entitled to recover the value of the property taken determined as of the time and place of taking. *In re Jordan*, 47 B.R. 712, 715 (Bankr.S.D.Ohio 1985). A plaintiff in a conversion action is often awarded interest from the time of the taking, *Lyle v. Durham*, 16 Ohio App.3d 1, 473 N.E.2d 1216 (1984), but an award of interest is generally within the discretion of the court. *Cincinnati Insurance Co. v. First National Bank of Akron*, 63 Ohio St.2d 220, 407 N.E.2d 519 (1980).

We find that the best measure of damages in this case is the amount of $1,459,-311.05. This amount reflects the value of the Kentucky Components as agreed to by the parties as set forth in the Master Governing Invoice and in the credit memorandum.

■ Associated has raised the defense of laches in an effort to limit Star Bank's damages to $250,000, the purchase price received by Associated for the Kentucky Components. The two essential elements of laches are the passage of time and the resulting hardship on the opposing party. *Van DeRyt v. Van DeRyt*, 6 Ohio St.2d 31, 38, 215 N.E.2d 698 (1966). Further, in order for laches to be a valid defense, the delay must be unreasonable, unexplained and inexcusable. 27 Am.Jur.2d *Equity* § 164.

■ Associated was in possession and control of the Kentucky Components in January, 1988 and sold them in late 1989. We find that Star Bank had knowledge of the removal and sale of some inventory to Associated sometime in 1988 but well after the fact. The Debtor filed its bankruptcy petition on November 15, 1989. Associated initiated the within adversary action by its complaint filed on December 1, 1989.

Associated has not met its burden to sustain a defense of laches. In view of the fact that there is a four (4) year statute of limitations under Ohio Rev.Code Ann. § 2305.09(B) for conversion actions, the delay was not unreasonable. Also, in view of Star Bank's testimony at trial that it was trying to work with this Debtor prior to the Debtor's filing of its petition, the delay was not unexplained or unreasonable.

As a final note, it appeared that the impetus for this peculiar transaction was a desire by Mr. Semler and Mr. Lee to creatively solve Debtor's problems engendered by ill will at E–Systems and debtor's precarious position with respect to its remaining government contracts. The UCC is not designed to stifle creativity, but to bring some semblance of order and predictability to commercial transactions. A little well placed legal advice would have opened numerous widely accepted ways of accomplishing this transaction. As it turned out, Associated was left with a precarious legal position and in the unenviable stance of arguing that a Master Governing invoice was not really an invoice, that a credit memo was not really a credit memo, and

that Associated's many references to Keystone's "debt" did not really mean debt. Of course, that position was muddied a bit by Associated's filing a claim in this case for $2,836,375.00.

The UCC simply does not allow this kind of infinite flexibility in deals such as this.

Judgment shall be granted against Associated and in favor of Star Bank in the amount of $1,459,311.05. Interest shall run from the date of entry of this judgment.

IT IS SO ORDERED.