RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0206p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

HBKY, LLC,

  *Plaintiff-Appellee*,

  *v.*

ELK RIVER EXPORT, LLC; ROBIN T. WILSON,

  *Defendants-Appellants*.

⎤
⎟
⎟
⎟
⎬  No. 24-5862
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:21-cv-00101—Gregory F. VanTatenhove, District Judge.

Argued:  April 30, 2025

Decided and Filed:  August 5, 2025

Before:  MOORE and NALBANDIAN, Circuit Judges.[*]

───────────────

## COUNSEL

**ARGUED:**  Rachele T. Yohe, BULLOCK & ASSOCIATES, LLC, Lexington, Kentucky, for Appellants.  Carte P. Goodwin, FROST BROWN TODD LLP, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  Rachele T. Yohe, Thomas D. Bullock, BULLOCK & ASSOCIATES, LLC, Lexington, Kentucky, for Appellants.  Carte P. Goodwin, Blake N. Humphrey, FROST BROWN TODD LLP, Charleston, West Virginia, Greg E. Mitchell, David C. Olson, GLOBAL REGULATORY RISK & COMPLIANCE PLLC, Frankfort, Kentucky, for Appellee.

───────────────

[*]During the pendency of this appeal, the Hon. Richard F. Suhrheinrich, a member of the original panel, retired.  Judge Moore and Judge Nalbandian act as a quorum pursuant to 28 U.S.C. § 46(d).

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge.   HBKY, LLC and Elk River Export, LLC, each claim thousands of acres of timber in Kentucky.   They interpret a series of timber sales contracts, security agreements, and mortgages differently.   Finding that HBKY had the better reading of the relevant documents, the district court granted summary judgment.   We agree, and so we affirm.

**I.**

HBKY and Elk River both had deals with a third company, Kingdom Energy Resources, LLC.   Kingdom contracted with Elk River for Elk River to cut and remove timber from certain land.   But Kingdom also took out a $22 million loan from a group of lenders, who set up HBKY to handle the loan.[1]   In return, Kingdom mortgaged several properties—including those on which the timber stood—and gave HBKY a security interest in them.   Kingdom executed the loan with HBKY in June 2016.   And Kingdom signed the operative contract with Elk River in March 2017.[2]

Kingdom didn't follow through on its obligations with either Elk River or HBKY.   First, Kingdom ousted Elk River from the properties, breaching the timber contract.   Then, Kingdom didn't pay back the loan, leaving HBKY in the lurch.   That left Elk River and HBKY both with valid legal claims against Kingdom, but also competing for the same prize—the timber.

In 2018, HBKY secured a judgment in New York federal court declaring Kingdom in default on the loan.   HBKY then registered that judgment in the Eastern District of Kentucky and began foreclosing on the collateral, including the timber, located there.   The foreclosure suit

———————————

[1]From now on, we refer to the lenders (and their interests) as HBKY (and HBKY's interests).   HBKY is technically the lenders' agent and assignee.

[2]Elk River and Kingdom first signed a timber contract on May 5, 2016, before the secured loan's execution.   But they renegotiated several times and kept settling on different terms.   They replaced the original contract with a new one on May 11, 2016, also before Kingdom mortgaged the timber to HBKY.   After the loan and mortgage, Elk River and Kingdom renegotiated again with a third timber contract on July 7, 2016.   They did so for the final time on March 1, 2017.

joined Elk River and its president, Robin Wilson, as defendants who claimed an interest in the collateral.

The district court granted summary judgment to HBKY, rejecting all of Elk River's arguments—Elk River didn't take title to the timber under the contracts, didn't have a superior interest, and wasn't a buyer in the ordinary course of business. Elk River appealed.

**II.**

District courts grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review summary-judgment grants de novo. *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024).

The parties agree that Kentucky law, including its adoption of the Uniform Commercial Code (UCC), governs the contracts and loan documents. In a secured transaction under Article 9 of the UCC, a borrower who takes a loan gives the lender a security interest in some property— the collateral—to ensure repayment of the debt. The secured lender can foreclose on the collateral if the debtor defaults. *See* Ky. Rev. Stat. Ann. § 355.9-201, 203, 601.

When Kingdom took out the loan, HBKY took a security interest in the timber. Generally, a valid, perfected security interest prevails over other interests. Ky. Rev. Stat. Ann. § 355.9-201. So the question is whether Elk River can trump HBKY's security interest.

Elk River has two main arguments. First, it argues that the loan documents carved out an exception for the timber, authorizing the sale to Elk River free of the security interest. Second, Elk River claims that it bought the timber in the ordinary course of business.

**A.**

We first consider the authorized-sale theory. When a debtor sells collateral, the security interest follows the collateral through the sale "unless the secured party authorized the disposition free of the security interest." Ky. Rev. Stat. Ann. § 355.9-315(1)(a). Thus, without the secured party's consent, "a debtor cannot avoid or nullify a security interest in property by

sale or transfer." *In re Bluegrass Ford-Mercury, Inc.*, 942 F.2d 381, 386 (6th Cir. 1991) (Kentucky UCC).

The secured party must authorize a sale *free of the security interest* to release the security interest. In other words, the secured party must give consent for both the sale *and* the dissolution of the lien. *See id.* So consent to "the sale of secured property" isn't necessarily the same as consent to "a transfer free of a security interest." *Wegner v. Grunewaldt*, 821 F.2d 1317, 1321 (8th Cir. 1987) (South Dakota UCC); *see also In re S. Props., Inc.*, 44 B.R. 838, 842 (Bankr. E.D. Va. 1984) (same under Virginia UCC); *In re Hanson Restaurants, Inc.*, 155 B.R. 758, 761–62 (Bankr. D. Minn. 1993) (same under Minnesota UCC). If the secured party authorizes a sale but doesn't lift the lien, the transferee can still lawfully take the collateral. But he takes it encumbered.

HBKY did not agree to release its security interest. When Kingdom mortgaged its property as collateral for the loan, Kingdom and HBKY agreed that HBKY would take "a continuing security interest in . . . [a]ll . . . timber." R. 316-7, Mortgage, p.2–3, PageID 6296–97. The mortgage provided that this security interest was a "valid, perfected first priority lien." *Id.* at p.7, PageID 6301. And it stated that "the lien of this Security Document shall be absolute and unconditional." *Id.* at p.23, PageID 6317.

The mortgage also discussed sales of the collateral. It provided: "The lien and security interest hereof shall not in any manner be impaired or affected by . . . sale . . . or disposition of any of the Secured Obligations, or of any of the collateral or security therefor . . . ." *Id.* Put simply, any "sale" of the collateral would not "impair[]" the security interest. So the parties did not agree to lift the security interest upon the timber's sale.

In response, Elk River points to three provisions of other documents that were part of the larger loan package. First, Elk River notes that the Security Agreement stated: "Except for the sale or lease of Inventory in the ordinary course of business and other sales of assets expressly permitted by the term of the Note Purchase Agreement, each Debtor will keep the Collateral at the locations specified." R. 1-7, Security Agreement, p.11, PageID 859. Elk River argues that this clause assumed that timber sales would go forward.

Second, Elk River cites the Note Purchase Agreement, which provided that HBKY would "establish . . . procedures acceptable to [HBKY], in [HBKY's] sole discretion, for the collection of checks, wire transfers, revenues, sales proceeds (including, without limitation from the sale of timber . . .)." R. 317-6, Note Purchase Agreement, p.4, PageID 8075. Elk River again insists that this clause assumed that Elk River would sell timber—how else would it give HBKY "sales proceeds" from a "sale of timber"?

Third, Elk River points to the Royalty Assignment. In that document, Kingdom warranted to HBKY "that the Royalty Interests conveyed to . . . [HBKY] are each free and clear of any and all . . . encumbrances or burdens other than . . . [the] Timber Sale Contract between Grantor and Elk River Export, LLC." R. 50-3, Royalty Assignment, pp.1–2, PageID 1886–87. The Royalty Assignment also stated that Kingdom was supposed to market and sell the timber. *Id.* at p.3, PageID 1888.

While these references may show that HBKY expected Kingdom to sell timber and knew of Kingdom's dealings with Elk River, they don't show that HBKY agreed to extinguish its security interest. The various legal instruments, executed together as part of one larger transaction, must be interpreted together. *See ABCO-BRAMER, Inc. v. Markel Ins. Co.*, 55 S.W.3d 841, 845 (Ky. Ct. App. 2000). And while the Security Agreement, Note Purchase Agreement, and Royalty Assignment may authorize timber sales, the mortgage makes clear that HBKY's security interest will survive any sale—a "sale" shall not "impair[]" the security interest. R. 316-7, Mortgage, p.23, PageID 6317.

Can we still find some sort of implied release? Elk River thinks so. As support, it cites one case, *Universal C.I.T. Credit Corp. v. Middlesboro Motor Sales, Inc.*, which held that authorization to sell goods in the ordinary course of business can be authorization free of the lien. 424 S.W.2d 409, 412–13 (Ky. Ct. App. 1968). The agreement in that case provided that the debtor had "liberty to exhibit and to sell each chattle [sic] in the ordinary course of trade and for the respective Principal Obligations shown in the respective statements." *Id.* at 412 (internal quotation marks omitted). At face value, this looks a little like Kingdom's situation; Elk River argues that the loan documents let Kingdom sell trees in the ordinary course.

Similarly, the Kentucky Supreme Court has found authorization free of a security interest implied under some circumstances.  In *Trimble v. North Ridge Farms, Inc.*, the court held that a security agreement allowing collateral to "be sold, exchanged or otherwise transferred or assigned" permitted a transferee to take the property sans lien.  700 S.W.2d 396, 397–98 (Ky. 1985).

But neither *Universal C.I.T. Credit Corp.* nor *Trimble* govern here.[3]  In neither case did the contracts explicitly say that the security interest would remain unaltered by any sale.  The mortgage in this case does.  So Kingdom could dispose of the timber, but the mortgage made clear that HBKY would keep its security interest, whatever happened to it.

---

[3]We also have questions about these cases' applicability today because the relevant UCC language has since changed.

Before 2001, the UCC and the Kentucky UCC required that "the disposition . . . was *authorized*," without a clear statement that the sale be *authorized free of the security interest*.  The old language was more amenable to finding implied releases, as *Universal C.I.T. Credit Corp.* and *Trimble* show.  *See* Pre-Revision U.C.C. § 9-306(2), *in* Appendix O, Uniform Commercial Code (Am. L. Inst. & Nat'l Conf. of Comm'rs on Unif. State L. 2023) ("[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party* in the security agreement or otherwise.") (emphasis added); 1958 Ky. Acts 396 ("[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor *unless his action was authorized by the secured party . . . .*") (emphasis added).

To be sure, the official commentary didn't favor implied releases.  It remarked that a "transferee will acquire the collateral free and clear of a preexisting security interest only if the disposition of the collateral by the debtor was authorized by the secured party *free and clear of the secured party's security interest*."  Pre-Revision U.C.C. § 9-306 cmt. 3, *in* Appendix O, Uniform Commercial Code (Am. L. Inst. & Nat'l Conf. of Comm'rs on Unif. State L. 2023) (emphasis added).  And other courts didn't favor implied releases.  *See Wegner*, 821 F.2d at 1321; *N. Com. Co. v. Cobb*, 778 P.2d 205, 208 (Alaska 1989).  Neither did the dissent in *Trimble*.  700 S.W.2d at 398 (Stephenson, J., dissenting) ("We should afford more dignity to a recorded security interest . . . . Any authorization in accordance with the statute should be specific and not by inference.").

But in 2000, the text of the UCC and Kentucky UCC was amended (effective 2001).  Now the text states that a security interest continues "unless the secured party authorized the disposition free of the security interest."  U.C.C. § 9-315(a)(1) (Am. L. Inst. & Nat'l Conf. of Comm'rs on Unif. State L. 2023); 2000 Ky. Acts 1321 (codified at Ky. Rev. Stat. Ann. § 355.9-315(1)(a)).  According to the commentary, this change "makes explicit that the authorized disposition to which [the provision] refers is an authorized disposition 'free of' the security interest."  U.C.C. § 9-315 cmt. 2 (Am. L. Inst. & Nat'l Conf. of Comm'rs on Unif. State L. 2023); Ky. Rev. Stat. Ann. § 355.9-315 cmt. 2.

So whatever the correct reading of the pre-2001 UCC text, it's possible that the Kentucky courts would approach implied releases differently today.

**B.**

Even when a secured party doesn't agree to release his lien, a later buyer can still claim the collateral lien-free as a "buyer in the ordinary course of business."  Such a buyer "takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."  Ky. Rev. Stat. Ann. § 355.9-320(1).

This defense has several elements.  The party must "buy[] goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind."  Ky. Rev. Stat. Ann. § 355.1-201(2)(i).  A sale in the "ordinary course" must comport "with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices."  *Id.*

This defense protects good-faith buyers when the secured party leaves the collateral with a debtor who sells goods of that kind.  By doing so, the secured party "confers apparent authority on the debtor to sell the goods," and the law protects the buyer over the secured party, who assumes the risk of the debtor making an unauthorized transaction.  *Madison Cap. Co., LLC v. S & S Salvage, LLC*, 765 F. Supp. 2d 923, 931 (W.D. Ky. 2011) (Kentucky UCC), *aff'd*, 507 F. App'x 528 (6th Cir. 2012).

We're on summary judgment, so the burden generally rests on HBKY (as the moving party) to make its case.  But at trial, Elk River would bear the burden of proof on "buyer in the ordinary course," an affirmative defense.  *See United States v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 889 F.2d 1248, 1253–54 (2d Cir. 1989).  And when the nonmovant will bear the burden, the movant has to demonstrate "that the nonmoving party has failed to make a showing sufficient to establish the existence of an essential element of that claim."  *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020) (internal quotation marks omitted).

HBKY has met its burden.  HBKY has shown that Elk River hasn't provided evidentiary support for each element of its defense.  Elk River failed to do so below, and it can't cure that problem on appeal.

We acknowledge that Elk River did do enough on one or two elements—for example, on the "buyer of goods in good faith" prong. Elk River's briefing (below and here) argues at length that the contracts gave it title (not an "option") to the trees as goods (not real property), and we understand this argument to go, at least partially, to the "buyer in ordinary course" elements. The district court rejected Elk River's title argument by misapplying the law of property interests in standing timber.

A "sale of standing trees, in contemplation of their immediate separation from the soil . . . is a constructive severance of them, and they pass as chattels." *Cheatham v. Head*, 262 S.W. 622, 623 (Ky. Ct. App. 1924) (internal quotation marks omitted). The term "immediate separation" or "immediate severance" is a bit of misnomer. It "does not mean a severance 'at once.'" *Id.* at 624. It's "a relative term and contemplates a severance as soon as can reasonably be done under the circumstances, which include the amount of timber, its accessibility, labor conditions, etc." *Id.* It means that the timberer must begin working diligently and remove the trees with reasonable speed, not that the trees must be removed by tomorrow.

A timber purchaser generally forfeits title to any trees not removed during the contractual time window. But if the purchaser "was prevented . . . by act of the seller from removing" any timber during that time, then he does not forfeit it. *Ream v. Fugate*, 97 S.W.2d 11, 14–15 (Ky. Ct. App. 1936). So when a landowner improperly ousts a purchaser from the land, courts will add a "reasonable time" on to the term. *Wright v. Cline*, 189 S.W. 425, 426 (Ky. Ct. App. 1916).

The district court ruled that the timber contracts weren't for title, but the court did not conduct the multi-factor "immediate severance" analysis that Kentucky caselaw calls for. *See Cheatham*, 262 S.W. at 623–24. We aren't sure that the contracts were for title—but we aren't sure that they weren't, either. If the case turned solely on this point, summary judgment would've been improper.[4]

The district court also erred in ruling that Elk River forfeited its right to whatever timber it hadn't yet cut down. Kingdom ousted Elk River in breach of the contract, meaning that the

---

[4]We don't think the record holds enough evidence to say—as a matter of law—that the contracts were or weren't for "immediate severance." Declining to give summary judgment to HBKY wouldn't have necessarily meant granting it to Elk River.

clock stopped running.  *See Ream*, 97 S.W.2d at 14–15.  How could Elk River have exercised its rights while Kingdom blocked access to the land?**5**

But all of this helps Elk River on only one part of its defense.  Questions about title and buyer-of-goods status only get the company so far.  In its district-court briefing, Elk River didn't apply the law to the facts on the defense's remaining elements with argument and citation to record evidence.  Aside from the title discussion, Elk River's analysis consists of two sentences:

> The Plaintiff does not even attempt to claim that Elk River purchased the timber "with knowledge that the sale violates the rights of another person in the goods[.]" [DN 316, 317.]  In fact, the opposite is true as the Royalty Collateral Agreements explicitly authorize Kingdom to market and sell the timber, and these agreements also specifically identify prospective timber contracts by and between Kingdom and Elk River therein.  [DN 50-3.]

R. 321, Elk River Resp./Reply, p.8, PageID 9865 (citations in original).  That's it.  In other words, there's one sentence about what HBKY didn't demonstrate, even though it's Elk River's burden to provide affirmative support.  And there's another sentence arguably claiming that Elk River had no malintent.

But Elk River never showed the district court that Kingdom was "in the business of selling" timber, or that Elk River took title "in the ordinary course."  Ky. Rev. Stat. Ann. § 355.1-201(2)(i).  The district court wasn't told what Kingdom's business was, how it operated, how the contracts with Elk River came about—or much else about Kingdom.  Elk River

---

**5**Elk River also argued below that if it had secured title to the timber before the loan, then HBKY never took a valid security interest.  It's true that if the pre-loan contracts gave title to Elk River in May 2016, then Kingdom wouldn't have had any title to mortgage in June 2016 (save, perhaps, a reversionary interest).  *See supra* note 2 (pre-mortgage contracts); Ky. Rev. Stat. Ann. § 355.9-203(2) (debtor must have "rights in the collateral" to give a valid security interest); *Bach v. Little*, 131 S.W. 172, 173 (Ky. Ct. App. 1910) (reversion in standing timber).  On appeal, though, Elk River hasn't renewed its argument that HBKY never took a valid security interest.  So we do not reach the issue.

Elk River tacks on an issue-preclusion argument for good measure.  Years after this case's events, a state court declared Kingdom in breach for ousting Elk River, and Elk River now suggests that the state-court judgment precludes HBKY from disputing who has title to the timber.

It doesn't.  First, the state-court decision expressly noted that Elk River's rights remained subject to HBKY's foreclosure action in federal court.  Second, issue preclusion wouldn't apply anyway.  Title wasn't actually litigated or necessary to the state-court judgment, and HBKY wasn't a party in that suit.  *See Weatherford U.S., L.P. v. U.S. Dep't of Lab.*, 68 F.4th 1030, 1039 (6th Cir. 2023).

provided no declaration, interrogatories, or deposition testimony asserting that Kingdom was in the timber business.**6** Nor did it offer business records or other evidence to that end.

On appeal, Elk River directs us to HBKY's complaint, which joined many defendants claiming an interest in the collateral. One such defendant is Columbia Plywood Corporation, who the complaint alleges also had a timber contract for some of the land (we aren't given further details). This contract, Elk River suggests, is evidence of Kingdom's involvement in the timber business.

The Columbia contract doesn't do Elk River any good. First, Elk River didn't cite it in the district court, and at summary judgment, district courts "need consider only the cited materials." Fed R. Civ. P. 56(c)(3). While a district court *can* look around for other evidence in the record, nothing requires it to. "Judges are not like pigs, hunting for truffles buried in the record." *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (cleaned up). And it's "especially important" to hold parties to their burdens in cases—like this one—where the record spans tens of thousands of pages. *Id.*

Second, even considering the Columbia contract, there's still insufficient evidence to establish Kingdom as regularly engaged in the timber business. Evidence on what constitutes ordinary-course business can take many forms, such as testimony from a person with knowledge of the company and industry norms. *See, e.g.*, *Fordyce Bank & Tr. Co. v. Bean Timberland, Inc.*, 251 S.W.3d 267, 272–73 (Ark. 2007) (sufficient evidence when several witnesses testified about industry practices and how their companies operated); *Am. Nat'l Bank & Tr. Co. of Chi. v. Mar-K-Z Motors & Leasing Co.*, 309 N.E.2d 567, 568–69 (Ill. 1974) (sufficient evidence that company was in the business of selling cars when the company's witness testified that his company ordinarily leased and sold cars). But we don't have anything like that here. No declarations, deposition testimony, or business records showing that Kingdom was engaged in

---

**6**Elk River's fallback—that the district court should've denied judgment for HBKY in favor of more discovery—falls flat. Elk River began the round of summary-judgment briefing in the district court. (Both parties ultimately moved; recall that this appeal concerns HBKY's motion.)

the business of selling timber or that Elk River bought timber in the ordinary course of that business.**[7]**

It's true that Kingdom sold timber to *Elk River*. But one transaction alone does not suffice. Companies make one-off or side deals all the time, disposing of assets outside their primary business. And courts have routinely found that those transactions, by themselves, aren't enough to prove that a company is regularly engaged in certain business. *See McKenzie v. Oliver*, 571 S.W.2d 102, 108 (Ky. Ct. App. 1978) (car rental company not in the business of *selling* cars, even though it sold one car); *Madison Capital*, 765 F. Supp. 2d at 930 (mining company in the business of mining, not selling mining equipment, even though it sold some equipment); *In re Keystone Gen., Inc.*, 135 B.R. 275, 281 (Bankr. S.D. Ohio 1991) (radio retailer in the business of selling completed radios, not radio parts).

In sum, this record doesn't tell us very much about who Kingdom is or what it does. The record thus doesn't support Elk River's status as a "buyer in the ordinary course of business."

**IV.**

The loan didn't carve out any exception to HBKY's first-priority lien, and Elk River hasn't shown that it purchased the timber in the ordinary course of business. We affirm.

---

**[7]**Which is all the more curious because in the state-court case, *see supra* note 5, Elk River president Robin Wilson did offer testimony, drawing on his "personal knowledge of the parties' agreement" and his expertise "be[ing] in the timber businesses for over 30 years." R. 313-1, Bell Circuit Court Judgment, p.2, PageID 5542.