FORDYCE BANK & TRUST CO. *v.*
BEAN TIMBERLAND, INC., Potlatch Corporation,
and Idaho Timber Corp. of Carthage, Inc.

06-734                                        261 S.W.3d 267

Supreme Court of Arkansas
Opinion delivered March 1, 2007

*Ronnie A. Phillips, LTD*, by: *Ronnie A. Phillips*, for appellant.

*Walthall Law Firm, P.A.*, by: *G. Christopher Walthall*, for appellee Idaho Timber Corp. of Carthage, Inc.

*Haley, Claycomb, Roper & Anderson*, by: *Richard L. Roper*; *Williams & Anderson, PLC*, by: *Beth M. Deere* and *Clayborne S. Stone*, for appellee Potlatch Corporation.

*Bridges, Young, Matthews & Drake, PLC*, by: *Michael J. Dennis*, for amici curiae Arkansas Forestry Ass'n, Arkansas Timber Producers Ass'n, and Arkansas Forest and Paper Council.

*Whetstone & Spears*, by: *Joe Woodson* and *Don Spears*, for amici curiae Arkansas Bankers Ass'n.

Tom Glaze, Justice. This appeal requires our court to determine whether appellees Potlatch Corp. ("Potlatch") and Idaho Timber Corp. ("Idaho") are buyers in the ordinary course of business under the Uniform Commercial Code ("UCC"). *See* Ark. Code Ann. § 4-9-320 (Repl. 2001).

The appellant in this case, Fordyce Bank & Trust Co. ("Fordyce" or "the Bank"), issued several loans to appellee Bean Timberland ("Bean") so that Bean could purchase timber from various landowners. Bean gave the Bank security interests in the purchased timber, and the proceeds from the sale of the timber were intended to repay the loans the Bank had made to Bean. The Bank, intending to perfect its security interests, filed its UCC Financing Statements with the Secretary of State's Office. However, when Bean sold the timber to the various lumber mills with which it did business, including Potlatch and Idaho, Bean failed to remit the sales proceeds to the Bank.

The Bank filed suit against Bean, Potlatch, and Idaho on February 19, 2004. In its complaint, the Bank alleged that Bean had known that the Bank had a valid first lien on the timber covered by the security interests. In addition, the Bank alleged that Potlatch and Idaho had both "negligently entered into contracts" with Bean for the purchase of timber and had "failed to exercise good faith" in those transactions. The Bank further contended that Potlatch and Idaho had been "negligent in failing to request a lien search of the UCC records [from] the Arkansas Secretary of State's Office." Had Potlatch and Idaho conducted a lien search, the Bank argued, they would have discovered the Bank's "properly recorded and perfected financing statement and security agreement granting [the Bank] a valid first lien."

The case was tried at a bench trial in the Dallas County Circuit Court.[1] Following the close of the Bank's case, the trial court granted Potlatch's and Idaho's motions for directed verdict

---

[1] Bean, which went into bankruptcy at some point prior to the filing of the lawsuit, filed an answer in which it denied having perpetrated a fraud against the Bank, but admitted that it had defaulted on the notes and that the Bank should be "entitled to proceed with

on the Bank's negligence and fraud claims.[2] Following the trial, the court later entered an order in which it found that Potlatch and Idaho were buyers in the ordinary course of business, and thus they were not required to perform a lien search on the timber purchased from Bean. The trial court dismissed the Bank's complaint, and the Bank filed a timely notice of appeal.

In its first point on appeal, the Bank argues that the trial court erred in granting a dismissal on the negligence count "since the UCC does not preempt common law negligence." The gist of the Bank's argument is that the trial court improperly "based its ruling upon its perception that the UCC preempted a common law negligence action." However, it is not apparent from the arguments on the motions to dismiss that the Bank raised its preemption argument in its response to the defendants' motions; nor is it apparent in the trial court's ruling on the dismissal motions that the court ruled that the UCC preempts the common law of negligence. In ruling on the defendants' motions, the court stated as follows:

> COURT: [T]his is a complicated case, and it is in an area where there is obvious disagreement as to what the law allows. It is helpful to the court to hear the facts, which I have now heard, and review the law. The easy issue would be to grant a directed verdict on the theory of fraud and common law negligence.
>
> It appears that this is a UCC case, and it will rise or fall depending on the interpretation of those provisions cited by counsel in their arguments. I am going to deny the motions for directed verdict at this time, hear all of the evidence, and then have a chance to review the law applicable to those facts.
>
> IDAHO'S COUNSEL: Did you grant a directed verdict as to common law fraud and —
>
> COURT: Fraud and common law negligence.

liquidation of any collateral which is security for debt owed by Bean Timberlands, Inc." Bean has not filed a brief in this appeal; the issues on appeal are solely related to the Bank's claims against Potlatch and Idaho.

[2] Although the trial court and counsel refer to the defendants' motion for directed verdict, because this was a bench trial, the motion made was one to dismiss, and we will treat it as such. *See* Ark. R. Civ. P. 50(a) (2006).

IDAHO'S COUNSEL: Thank you.

■ In order to preserve an issue for appellate review, the Bank was obligated to obtain a specific ruling on it from the trial court. This court has held that it will not review a matter on which the trial court has not ruled, and a ruling should not be presumed. *Vaughn v. State*, 338 Ark. 220, 992 S.W.2d 785 (1999). Moreover, the burden of obtaining a ruling is on the movant; objections and matters left unresolved are waived and may not be relied upon on appeal. *Camden Community Dev. Corp. v. Sutton*, 339 Ark. 368, 5 S.W.3d 439 (1999); *McElroy v. Grisham*, 306 Ark. 4, 810 S.W.2d 933 (1991). Here, the court simply stated that it would grant the directed-verdict motions "on the theory of fraud and common law negligence." Without a specific determination that the common-law-negligence claims were preempted by the UCC, this court cannot address the Bank's arguments on this issue on appeal.

We next turn to the Bank's second point on appeal, wherein it contends that the trial court erred in granting Potlatch's and Idaho's directed-verdict motions because there was sufficient evidence of negligence. Under Arkansas law, in order to prevail on a claim of negligence, the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injuries. *See Branscumb v. Freeman*, 360 Ark. 171, 197 S.W.3d 449 (2004); *Wilson v. Rebsamen Ins., Inc.*, 330 Ark. 687, 957 S.W.2d 678 (1997). In its complaint, the Bank asserted that Potlatch and Idaho were negligent in failing to request a lien search of the UCC records in the Arkansas Secretary of State's Office. In its second point on appeal, the Bank asserts that the trial court improperly granted Potlatch's and Idaho's motions for directed verdict despite testimony that Potlatch and Idaho should have known that their timber purchases from Bean were secured by financing, which would give rise to a duty to check for liens with the Secretary of State. Thus, to answer the question raised on appeal, this court must determine whether Potlatch and Idaho had a duty to perform a lien search; in turn, the answer to this question depends on whether Potlatch and Idaho were buyers in the ordinary course of business.

A buyer in the ordinary course of business is defined in Ark. Code Ann. § 4-1-201(9) (Repl. 2001), in pertinent part, as follows:

"Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. *A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.* . . .

(Emphasis added.)

Under Ark. Code Ann. § 4-9-320(a) (Repl. 2001), a buyer in the ordinary course of business "takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." Thus, if Potlatch and Idaho were buyers in the ordinary course of business, they would be under no duty to perform a lien search, because even if they knew of a lien and had performed a lien search, they could nonetheless take free of the Bank's security interest.

To determine whether Potlatch and Idaho were buyers in the ordinary course of business, the court must look to see whether the sale to them "comport[ed] with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices." *See* Ark. Code Ann. § 4-9-320(a). Evidence presented at trial clearly showed that Potlatch and Idaho's practices were "usual or customary" in the timber business.

Bean sold timber to various mills as "gatewood." Gatewood is severed timber that is brought to a lumber mill's front gate by a logger; the wood is weighed and inventoried, and if the timber meets the mill's specifications, the mill will purchase it. If the wood does not meet specifications, the mill will not buy it. Numerous witnesses testified that purchases of gatewood are common in the Arkansas logging industry. For example, Robert Frey, the raw material procurement and marketing manager for Weyerhauser in Arkansas and Oklahoma, testified that the "basic way" the timber industry does business is for a mill to have written contracts with loggers or timber producers; those contracts would have specifications that set the mill's requirements for timber that it would accept.

Frey testified that lumber mills, such as Weyerhauser, would not typically go out and look at growing timber before it was cut, but would instead purchase it at the mill gates based on specifica-

tions. The gatewood system, according to Frey, was a "common way of doing business in the timber industry in Arkansas," and most companies that he knew about conduct business in this manner. Further, Frey testified that Weyerhauser does not perform title searches for liens and ownership on any gatewood timber. Frey also noted that, if Bean "delivers all of his product as gatewood, that is normal if that is how he does business. There is nothing wrong with that."

Frey testified that Weyerhauser does not conduct title searches at the county courthouse or at the Secretary of State's office on gatewood; however, it would do a title search and obtain a legal description of the tract for standing timber (as opposed to the cut timber of the type Bean sold) in order to make sure that the supplier was bringing the timber that the mill had contracted for.

Mack Smith, procurement manager for Idaho, testified that he had held that position for twelve and a half years. It was not Idaho's practice to do a title or lien search on the timber it purchased unless the person from whom the mill was buying was "someone we have never heard of." Smith stated that he had never bought anything other than gatewood from Bean, and that there was nothing that Bean did that was out of the ordinary course of business.

Steve Barham, the general manager of Anthony Forestry Products Company, testified that Anthony had not checked title to any gatewood in the three and a half years he had been with the company. He said that there was nothing in the operation of Idaho's mill that was out of the ordinary course of business. On cross-examination, Barham stated that Anthony has no control in the harvesting of gatewood, and he reiterated that his company does no title searches on gatewood. He further stated that, prior to the trial, he had not even been aware that one could do a lien search with the Secretary of State's office on gatewood.

The procurement manager for Potlatch's Prescott mill, Jim Cornelius, testified that nothing in Potlatch's gatewood purchases from Bean did "anything to cause alarm." Cornelius also stated that he had no actual knowledge that the Bank had a security interest in Bean's inventory. He also declared that, in his thirty years in timber procurement, he had "never undertaken a search for security interests in gatewood," and that Potlatch "does not perform lien searches in any other state, either."

Finally, Joe Willett, procurement manager for Deltic Timber Corporation's Waldo mill, testified that he has a bachelor's

degree in forestry and had worked for Deltic for twenty- six years. Willett stated that the way Bean Timberland was doing business with Potlatch and Idaho Timber "sounded good to [him]," and that if Mr. Bean had been in his office, Willett would have bought his logs. Willett also noted that, despite the growing trend toward mills' purchasing gatewood, he did not believe there would be more problems of the type raised in this case. He also noted that, if mills were required to perform a lien check every time a load of gatewood came in, the mills would not take gatewood: "If lien searches were required . . . , if we had that hanging over our head every time a truckload crossed the scale, we would not let it come in."

In sum, the trial court had before it abundant evidence that purchasing gatewood without performing a lien search was the standard practice in the timber industry. Clearly, Bean's sales to Potlatch and Idaho, and Potlatch's and Idaho's practice of not conducting lien searches, "comport[ed] with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices." *See* Ark. Code Ann. § 4-9-320(a). As such, the trial court correctly determined that Potlatch and Idaho were buyers in the ordinary course of business. Further, because the mills were buyers in the ordinary course of business, they owed the Bank no duty to conduct a lien search. With no duty, there could be no breach of any duty. *See Mans v. Peoples Bank of Imboden*, 340 Ark. 518, 10 S.W.3d 885 (2000) (if the court finds that no duty of care is owed, the negligence count is dismissed as a matter of law). Therefore, the trial court properly granted a directed verdict on the Bank's negligence claims.

Nonetheless, the Bank contends in its third point on appeal that Potlatch and Idaho could not have been buyers in the ordinary course of business because the wood they purchased from Bean was not "inventory." The Bank urges that the trial court erroneously concluded that the cut timber was "the type of inventory" covered by the buyer-in-the-ordinary-course-of-business protection. The Bank states that the UCC provides such protection in this case only if the goods can be classified as inventory.

Under the UCC, "a security agreement is effective according to its terms between the parties, against purchases of the collateral, and against creditors." Ark. Code Ann. § 4-9-201(a) (Repl. 2001). In this case, the security agreement is between the Bank and Bean. That security agreement between the Bank and

Bean, filed in the Secretary of State's office, was intended to secure the payment and performance of Bean's debts, liabilities, or obligations to the Bank, and it gave the Bank a security interest in cut timber.

The Bank concedes that the timber, once cut, becomes ordinary goods. *See* Ark. Code Ann. § 4-9-501 cmt. (Repl. 2001) ("Once cut, however . . . [*t*]*he timber then becomes ordinary goods.*") (emphasis added). However, the Bank urges that the cut timber, which is "goods," is not "inventory." This distinction is important to the Bank because the Commentary to Ark. Code Ann. § 4-9-320(a) states that the protection afforded to buyers in the ordinary course of business "applies primarily to inventory collateral." *See* Ark. Code Ann. § 4-9-320 cmt. (Repl. 2001).

All parties to this case agree that the cut timber is "goods." According to the commentary to Ark. Code Ann. § 4-9-102 (Repl. 2001), there are "four mutually-exclusive 'types' of collateral that consist of goods: 'consumer goods,' 'equipment,' 'farm products,' and 'inventory.'" The commentary continues as follows:

> The classes of goods are mutually exclusive. For example, the same property cannot simultaneously be both equipment and inventory.
>
> . . . .
>
> Goods are inventory if they are leased by a lessor or held by a person for sale or lease. . . . Goods to be furnished or furnished under a service contract, raw materials, and work in process also are inventory. Implicit in the definition is the criterion that the sales or leases are or will be in the ordinary course of business. . . .

Ark. Code Ann. § 4-9-102 cmt. (Repl. 2001). If cut timber constitutes "goods," it must be inventory if it is not consumer goods, equipment, or farm products.

Consumer goods are goods "that are used or bought for use primarily for personal, family, or household purposes." Ark. Code Ann. § 4-9-102(23) (Repl. 2001). Clearly, cut timber would not fall into this category. Equipment means "goods other than inventory, farm products, or consumer goods." Ark. Code Ann. § 4-9-102(33). The commentary notes that, generally speaking,

"goods used in a business are equipment if they are fixed assets or have, as identifiable units, a relatively long period of use." *See* Ark. Code Ann. § 4-9-102 cmt. This obviously does not describe cut timber. Finally, farm products are defined in § 4-9-102(34) (Repl. 2001), as follows:

> "Farm products" means goods, other than standing timber, with respect to which the debtor is engaged in a farming operation and which are:
>
> (A)  crops grown, growing, or to be grown, including:
>
> (i)  crops produced on trees, vines, and bushes;  and
>
> (ii)  aquatic goods produced in aquacultural operations;
>
> (B)  livestock, born or unborn, including aquatic goods produced in aquacultural operations;
>
> (C)  supplies used or produced in a farming operation;  or
>
> (D)  products of crops or livestock in their unmanufactured states.

Again, cut timber does not fall within any of these descriptions. Because timber is "goods," but it is not consumer goods, equipment, or farm products, then logically it must be inventory. Inventory means "goods, other than farm products, which . . . are held by a person for sale or lease or to be furnished under a contract of service; . . . or . . . consist of raw materials, work in process, or materials used or consumed in a business." Ark. Code Ann. § 4-9-102(48)(B) & (D) (Repl. 2001). The cut timber at issue in this case was held by Bean for sale to Potlatch and Idaho; therefore, the timber certainly meets the definition of inventory.

The Bank nonetheless urges that cut timber is not inventory because, if it is not, then Potlatch and Idaho are not entitled to the protections afforded to buyers in the ordinary course of business. However, although the Bank cites several cases from other jurisdictions that describe inventory as usually consisting of merchandise, the Bank offers no authority to the effect that

cut timber cannot constitute inventory.[3] Accordingly, we hold that the trial court correctly concluded that the cut timber at issue in this case is "inventory," and Potlatch and Idaho are buyers in the ordinary course of business.

Finally, the Bank urges that the provisions of the UCC giving a safe harbor to buyers in the ordinary course of business are inapplicable to option contracts.[4] The Bank urges that the contracts Bean had with Potlatch and Idaho were option contracts, and that the UCC does not apply to option contracts. However, the record reveals that the Bank never raised this argument before the trial court. Consequently, it is not preserved for our review. This court has made it abundantly clear that it will not consider an argument raised for the first time on appeal. *See, e.g., Henyan v. Peek,* 359 Ark. 486, 199 S.W.3d 51 (2004); *Bailey v. Delta Trust & Bank,* 359 Ark. 424, 198 S.W.3d 506 (2004).

Affirmed.

---

[3] The Bank cites several cases for the proposition that the purpose of the buyer-in-the-ordinary-course-of-business provision is for the protection of purchasers who buy from merchants in the ordinary course of business. However, none of the cases cited by the Bank hold that timber cannot be inventory. *See Muir v. Jefferson Credit Corp.,* 108 N.J. Super. 586, 262 A.2d 33 (1970) (sale of an automobile); *Cunningham v. Camelot Motors, Inc.,* 138 N.J. Super. 489, 351 A.2d 402 (1975) (sale of an automobile); *Commercial Credit Equip. Corp. v. Bates,* 154 Ga.App. 71, 267 S.E.2d 469 (1980) (sale of a tractor); *Fleet Capital Corp. v. Yamaha Motor Corp., USA,* 2002 WL 31174470 (S.D.N.Y.), 48 UCC Rep. Serv. 2d 1137 (2002) (sale of a golf cart); *Kuemmerle v. United New Mexico Bank,* 831 P.2d 976 (N.M. 1992) (sale of inventory from a grocery store).

[4] An option contract is essentially "a contractual obligation to keep an offer open for a specified period, so that the offeror cannot revoke the offer during that period." *Black's Law Dictionary* 1127 (8th ed. 2004).