

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV–15–941

| | |
|---|---|
| DAVID GLENN EIFLING, TRUSTEE OF THE LUCILLE B. EIFLING TRUST<br>APPELLANT<br><br>V.<br><br><br>SOUTHBEND, INC.<br>APPELLEE | **Opinion Delivered:** September 14, 2016<br><br>APPEAL FROM THE LINCOLN COUNTY CIRCUIT COURT<br>[NO. LCV-2013-28-2]<br><br><br>HONORABLE ROBERT H. WYATT, JR., JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

The issues in this case arise from a boundary dispute involving a parcel of land located on the east side of Lake Dian in Lincoln County. David Glenn Eifling, representing the Lucille B. Eifling Trust (hereinafter "Eifling") argues on appeal that the boundary of the property should have been determined by the "top bank" of Lake Dian. Southbend, Inc. ("Southbend") responds that the circuit court correctly found that the boundary of Lake Dian is determined by the "ordinary high water mark" ("OHWM"). We find no error in the circuit court's determination of the boundary of the property in dispute, and we affirm.

A.    I. Factual History

On March 7, 2013, Southbend filed suit against Lakeside Plantation Farm, LLC. ("Lakeside") requesting that the circuit court determine that the boundary of a six-acre parcel of land east of Lake Dian was the OHWM. In the alternative, Southbend requested that the court find that it had adversely possessed the disputed property. In the event that

neither claim prevailed, Southbend asked the circuit court to grant a prescriptive easement along the existing road that crossed the property on the north end of Lake Dian. Southbend also requested that the circuit court bar Lakeside from further trespass on their land and that the court grant costs and attorney's fees.

Lakeside responded that Southbend's action was barred by the statute of limitations and by acquiescence. Lakeside also attached to its response a survey of Lake Dian that it had had done in November 2012. In the survey, the boundary of the lake was shown to be the top bank, rather than the OHWM. Lakeside argued that it was the owner of the property shown in the survey to the top bank "by virtue of multiple deeds, by survey, by acquiescence and by adverse possession based on payment of taxes[.]" Lakeside also attached a quitclaim deed recorded December 29, 1954, that described a parcel of land owned by Lakeside that lies west of Lake Dian. This quitclaim deed contained the following language:

> All that part of the E ½ of Section 10 and the West ½ of section 14 and the NE ¼ of Section 15 and W ½ of Section 23, in Township 8 South, Range 4 West which lies within the top bank of Lake Dian, it being intended to convey all of those portions of said Sections in or adjacent to said Lake not heretofore conveyed . . . [.]

In essence, both parties agreed that Lake Dian, as it was in 1950, was the boundary of the disputed land; however, they disagreed as to how the boundary of Lake Dian should be determined. Southbend argued that the lake's boundary should be determined by the OHWM, which would mean that the six acres between the lake and the top bank would belong to Southbend. Lakeside argued that the boundary ran along the top bank, and thus, anything between the lake and the top bank would be considered within the boundary of Lake Dian, making the disputed six acres the property of Lakeside.

SLIP OPINION

On September 3, 2014, the Eifling trust succeeded Lakeside in interest in the property.[1]

David Glenn Eifling, representing the Eifling trust, filed a supplemental answer and counterclaim on September 17, 2014. In it, Eifling asserted that after a boundary dispute in the 1950s, the predecessors in title to both parties had the land surveyed and the Eifling's predecessor in title placed a fence along the boundary, which was also the top bank of Lake Dian. Eifling argued that this fence had been recognized as the boundary until Charles Robertson, a tenant farmer who had worked for both Southbend and Lakeside, had mistakenly harvested the timber on the disputed land for Bobby McCool. Eifling asserted that neither he nor his mother could have known about Robertson's activities on the disputed land and that the clearing and selling of timber had been concealed from them. Eifling also asserted that whether or not the circuit court found that Robertson and Southbend had concealed their activity, Southbend was equitably estopped from claiming the disputed property.

Southbend filed an amended complaint on October 14, 2014, in which it asserted that a different fifty-year-old fence along the OHWM as it would have been in 1950 on the east and north ends of Lake Dian had been agreed on by all predecessors in title as the boundary of the lake and that their fence should be declared the boundary line.

On May 6, 2015, the matter came before the circuit court for a bench trial. Charles Robertson testified that he had worked for several families that owned land around the lake since around 1987 and that he had always understood that the west side of the lake belonged

---

[1]Lucille Eifling conveyed her land to her corporation, Lakeside, in 2004. The land was conveyed to the Eifling trust in 2014.

to the Eiflings. Robertson stated that as long as he had worked for the families who owned land around the lake, the Eiflings had never had anything to do with the disputed land. He stated that a levee had been built on the disputed land, and that a timber road ran through the land. Robertson testified that the Eiflings had never complained about the activity on the disputed land or asked for a share of the proceeds from the timber crop harvested from the six acres that he had managed for the McCool family. Robertson also testified that in the mid-1990s the dam had been raised about five feet and that if the water had reached the top bank, as the Eiflings argued, the land to the east, south and west would have been flooded "for miles," and that "it was not possible for the water" to rise as high as was claimed by the Eiflings. Robertson also asserted that he had conversed with Lucille Eifling years prior and that she had stated, and he agreed, that she did not own any land east of the lake.

A consulting forester, Rodney Wishard, testified for Southbend. He stated that he had been hired by Southbend to determine the OHWM of Lake Dian as it would have been in 1950. Based in part on the ages of various types of trees and each tree's unique ability to tolerate regular flooding, he determined the OHWM as it would have likely been in 1950. Aerial photos taken of Lake Dian in 1951 corresponded to his conclusion about the water level of the lake in 1950.

Robert C. Wynn, a land surveyor hired by Southbend to determine the boundary line of the disputed property, testified at the trial. Wynn described the OHWM this way: "The high water mark is a term they use for the vegetation changes for what will live under water and what will not live under water. Anything that will live within the water is below the high water mark and above it will not live in extended water."

Wynn also defined "top bank" and differentiated the two terms:

The top bank is more of a physical feature on the land, the dirt itself. It may be a quarter mile from water. I wouldn't say the top bank is the highest the water has reached but it is the normal high point of the water that it may reach and stay inside the banks of a river. It may be a point water reaches once a year. The high water mark is where it will stay enough for the vegetation to actually change.

Wynn testified that for the water to have reached the top bank as asserted by the Eiflings, it would have been nine feet over the dam and would have flooded the land to the south. He stated, "[I]t is obvious by looking that the top bank was much higher than the dam."

Bobby Boren McCool testified that in twenty-four years, he had never seen the water reach the road, and until this complaint, the Eiflings had never mentioned the land on the east side of the lake.

David Glenn Eifling testified at the trial on behalf of the Eifling trust. He explained that his father had bought their property west of Lake Dian at an auction in 1950. When a boundary dispute arose after the original conveyance, they had the 1954 quitclaim deed executed by Homer Albro, from whom they had bought their land, with the language "top bank of Lake Dian" added to describe the boundary in the original conveyance, which was "the boundary of Lake Dian as it was in 1950."

In his testimony, Eifling also described various drill pipes, strainer pipes, fence posts, and sections of fence that he asserted had been placed along the top bank to indicate where the boundary line was.

Jeff Denman, a consulting forester hired by the Eiflings to inspect the monument lines in the disputed area and to determine where the OHWM would have been in 1950, testified at the trial. Denman stated that he had observed strainer pipes, fence posts, and other markers

along the top bank that indicated a boundary line. Denman also stated that, based on his observations of the trees around Lake Dian, he would have drawn the OHWM as it was in 1950 differently than Wishard and Wynn's line was platted. Denman indicated on a map that he would have drawn the OHWM east of Wynn and Wishard's line, much closer to the top bank as it was platted by Steve Brown, the surveyor hired by the Eiflings.

Steve Brown testified at the trial. He explained that he had been hired before the litigation began to determine the boundary line of the Eifling's property. In order to do this, he examined the original deed that conveyed their parcel of land west of Lake Dian. Brown testified that he felt the original deed was too vague to get a clear idea of the boundary of Lake Dian as it was in 1950, so he looked to the 1954 quitclaim deed with the language describing the conveyance of land to the "top bank" of Lake Dian. Brown stated that he preferred this more specific language as an indication of the boundary of the lake. After determining that he would use the top bank as the boundary line, he surveyed the land and found monuments and old fencing along that line to support his determination.

On July 2, 2015, the circuit court entered its findings of fact and conclusions of law concerning the disputed land between the top bank and the lake. In its order, the circuit court discounted the importance of the Eiflings' 1954 quitclaim deed for two reasons: (1) title to all of the land east of the lake had been conveyed to Southbend's predecessor in interest in 1950, almost four years before the entry of the quitclaim deed; and (2) the quitclaim deed specifically stated that it did not include any land that had already been conveyed.

After finding that the quitclaim deed was not persuasive, the circuit court found that the issue in this case was "where was the boundary of the lake on February 24, 1950," and that determining the boundary of a lake "was not an exact science." In making its determination concerning the placement of the boundary line in 1950, the circuit court recounted the following testimony presented at the trial: Southbend's forester, Rodney Wishard, used a methodology involving tree species and their growth patterns to determine the OHWM. Surveyor Robert Wynn plotted the information compiled by Wishard on a plat. An aerial photograph of Lake Dian taken in the 1950s showed the areas where the lake water had stood long enough to stop timber from growing. Wishard's OHWM line, when overlaid on the aerial photograph, was "remarkably close to the farthest reach of the lake." A photograph of the water line reaching a metal post set along the Wynn plat line showed the water at its "highest point since the dam was raised in the 1990s." The circuit court found that the water reached that unusually high level only because a drainage pipe had been clogged and because there had been unusually heavy rain.

The circuit court also made findings concerning the history of the use of the disputed land. It found that Charles Robertson had been a tenant farmer for both parties and that Robertson had testified that Lucille Eifling had never objected to or questioned his statement that she did not own land east of the lake. No one from the Eifling family had ever objected to his clearing the disputed land for Southbend, nor had the Eiflings ever asked him to conduct any activity on their behalf on the east side of the lake.

The circuit court noted that the term "top bank" never came up in any of the Eifling deeds prior to this lawsuit. The circuit court also found that Southbend had undisputed and

adverse possession of the land for a period in excess of twenty years and that tax records reflected that Southbend had paid taxes on the land east of Lake Dian. The circuit court also found that David Eifling's and Steven Brown's testimony lacked credibility.

The circuit court found that a specific description prevails over a general description, and the specific description of the land in the 1954 deed was "Lake Dian as it existed on February 24, 1950." The circuit court determined that the OHWM was the boundary of the lake and that it was undisputed that the top bank of Lake Dian was not the same as the OHWM. The circuit court reiterated that the 1954 quitclaim deed did not diminish Southbend's interest in the disputed land, and it found that Southbend was entitled to an order quieting the title to the disputed land. The order doing so was entered on August 4, 2015, and Eifling filed a timely notice of appeal.

## II. *Points on Appeal*

Eifling raises the following points on appeal: (1) the circuit court erred when it did not find that the top bank of Lake Dian was the boundary by acquiescence; (2) Southbend's claim was barred by laches and the statute of limitations; (3) the OHWM is not the boundary line; (4) the circuit court erroneously found the location of the OHWM; (5) the circuit court erred when it found Southbend had adversely possessed the disputed land; and (6) the circuit court erred in dismissing Eifling's counterclaim. We find no error, and we affirm.

## B. Boundary by Acquiescence

Eifling asserts that the circuit court erred in failing to find that a boundary by acquiescence had been established along the top bank; however, there is no ruling from the circuit court on the issue of boundary by acquiescence. In order to preserve an issue for

appellate review, appellant is obligated to obtain a specific ruling on it from the circuit court. *Fordyce Bank & Trust Co. v. Bean Timberland, Inc.*, 369 Ark. 90, 94, 251 S.W.3d 267, 270 (2007). Our supreme court has held that it will not review a matter on which the circuit court has not ruled, and a ruling should not be presumed. *Id.* We decline to reach the issue of boundary by acquiescence for that reason.

### C.  B. Laches and the Statute of Limitations

Eifling argues that Southbend's claim was barred by laches and by the statute of limitations and that he "requested a legal conclusion on the issue" in his proposed findings of fact and conclusions of law filed June 22, 2015; however, the circuit court's order entered on July 2, 2015, does not address the issues of laches or the statute of limitations.

Again, Eifling failed to obtain a specific ruling on these issues, and thus, he waived his appeal on the matters. *See id.* In the present case, this court has nothing to review on the matters of laches and the statute of limitations, and we are unable to say whether the circuit court erred.

### D.  C. The Location of the OHWM and the
### E.  Circuit Court's Finding That it is the Boundary Line

Eifling argues that the circuit court erred when it determined the location of the OHWM in 1950 and when it found that this OHWM, and not the top bank, was the boundary for Lake Dian. On these two closely related points, we affirm. [2]

---

[2] Because the circuit court was correct in finding that the disputed land was rightfully the property of Southbend, we need not reach the issue of whether Southbend adversely possessed the six acres in question. In any event, we find no error in the circuit's ruling on the matter.

SLIP OPINION

We review boundary-line cases de novo. *Whitecotton v. Owen*, 2016 Ark. App. 120, at 1, 487 S.W.3d 380, 382. Because the location of a boundary is a disputed question of fact, we will affirm the circuit court's finding unless it is clearly against the preponderance of the evidence. *Reynolds v. GFM, LLC*, 2013 Ark. App. 484, 429 S.W.3d 336. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite conviction that a mistake was committed. *Id.* In reviewing findings of fact, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Stadler v. Warren,* 2012 Ark. App. 65, at 5-6, 389 S.W.3d 5, 8.

The circuit court relied on expert testimony in determining that the OHWM in 1950 should be the boundary of Lake Dian and in determining the location of that mark. Forester Rodney Wishard testified that, based on his observations of the tree growth within the disputed six acres, he could determine the OHWM as it was in 1950, and this line was platted by the land surveyor, Robert Wynn. The 1953 aerial photograph of the lake depicted a water level very close to the marks made by Wishard and Wynn. Wishard also testified that he observed old fencing along the OHWM that he had platted. Everyone agreed that the dam had been raised in the 1990s by about five feet, which the circuit court found would have allowed the water to reach higher levels than it did in the 1950s. Thus, the circuit court found that Wishard and Wynn had correctly platted the OHWM and that the OHWM—and not the top bank—was the proper boundary.

The circuit court also relied on Robertson's testimony that the Eiflings had never cultivated the disputed land or objected to any other party's use of the land and that Robertson and Lucille Eifling had discussed that the land did not belong to her.

The circuit court's finding that the boundary of Lake Dian was the OHWM helped settle the question of what effect Eiflings' 1954 quitclaim deed had on Southbend's boundary claim. Eifling argues on appeal that the quitclaim deed indicated that the top bank was the boundary of Lake Dian, and thus, the Eifling trust owned east of Lake Dian to the top bank. The circuit court found that the 1954 quitclaim to the "top bank" was limited by another statement in the same deed setting forth that "it being intended to convey all of those portions of said sections in or adjacent to said Lake not heretofore conveyed . . . . " Thus, the circuit court determined that the Eifling's predecessors never had title to the land between Lake Dian and the top bank because the land "within the boundary of Lake Dian" had already been conveyed. The disputed land was never conveyed by that quitclaim deed.

Both parties pointed to specific language in the quitclaim deed and in the original deed that supported their positions, and both parties presented expert testimony and anecdotal evidence in support of their arguments. We defer to the circuit court's superior position in weighing the credibility of the testimony, and we are not left with the conviction that a mistake was made. We find no error, and we affirm.

## F.  D. Eifling's Counterclaim

Because the court found that the Eiflings did not have title to the disputed land in any way, it was appropriate to dismiss the counterclaim for an accounting, an ejectment,

and payment of money owed them. In accordance with our holding above, we affirm the circuit court's decision to dismiss Eifling's counterclaim.

Affirmed.

ABRAMSON and GRUBER, JJ., agree.

*Bridges, Young, Matthews & Drake PLC*, by: *Joseph A. Strode*, for appellant.

*R. Victor Harper*, for appellee.